JUAN MARTINEZ,

                Plaintiff,

    -against-

JO ANNE B. BARNHART,
Commissioner of Social Security,

                Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:

NOT FOR PUBLICATION

OPINION AND ORDER

------------------------------------------------------------------ X

ROSS, United States District Judge:

      Plaintiff Juan Martinez brought this action pursuant to 42 U.S.C. §§ 405(g) to review

defendant Social Security Commissioner Barnhart's adoption of the decision of Administrative

Law Judge ("ALJ") Seymour Fier denying plaintiff's request for Social Security disability

insurance ("DI") benefits. Plaintiff initiated this action by complaint filed on October 4, 2004.

Defendant has moved for judgment on the pleadings pursuant to Rule 12(c). Plaintiff has cross-

moved for judgment on the pleadings. For the reasons stated below, the court denies defendant's

motion for judgment on the pleadings, reverses the Commissioner's decision, and remands the

case for further proceedings.[1]

---

     [1]Plaintiff has moved for outright reversal, asking the court to remand for "payment of
disability benefits to this plaintiff." Plaintiff's Memorandum of Fact and Law, 10. The court
finds outright reversal inappropriate at the present time. The court therefore remands for further
proceedings.

Plaintiff Martinez applied for DI benefits on January 12, 2001 (R. 45),[2] alleging disability since November 1, 2000 due to diabetes mellitus, numbness in his legs, and missing toes on his feet. R. 53. These claims were denied initially on June 20, 2001. R. 27. Plaintiff requested and was granted a hearing before an ALJ. R. 33. The hearing took place before ALJ Seymour Fier on February 25, 2003. R. 361. Plaintiff was represented by counsel. Id. By decision dated May 13, 2003, the ALJ found that plaintiff was not disabled and was able to perform light work, including his past relevant work as a restaurant worker. R. 25. The Appeals Council denied Mr. Martinez's request for review on August 27, 2004, making the ALJ's May 13, 2003 decision the final decision of the Commissioner of Social Security. R. 3-6. The instant action was timely commenced.

Plaintiff has since been found disabled based on a subsequent application filed on May 14, 2003, the day after ALJ Fier's decision in the instant case. Defendant's Memorandum of Law in Support of Her Motion for Judgment on the Pleadings, 29. The disputed period before the court, therefore, is from November 1, 2000 to May 13, 2003.

## 2.    **Medical and Work History**

Plaintiff was born in Mexico in May 1955; he is 50 years old. R. 45, 51. He came to the United States in 1980 and is now a United States citizen. R. 362. He has an eighth grade education. Id. Although plaintiff indicated on his initial Disability Report that he was able to

---

[2] "R." refers to the administrative record filed with the court by defendant Commissioner.

66-73), were filled out with the assistance of a translator, and plaintiff required the assistance of a translator during his ALJ hearing. R. 361. He also utilized a translator during his initial telephone contact with the Social Security Administration (R. 74), his Claimant Conference with the New York State Office of Temporary and Disability Assistance, Division of Disability Determinations (R. 76), and his meetings with his doctors and hospital personnel (see, e.g., R. 137, translator used during diabetes education session).

Between 1982 and July 2000, Mr. Martinez worked as a restaurant kitchen helper and cleaner, a counter person at a fast food restaurant, an assistant cook, and a street cleaner. R. 66, 363. Mr. Martinez stopped working in July 2000, when he was fired due to low performance. R. 53. Plaintiff reported that his most recent employment as a restaurant worker at Japan Restaurant, from 1989 to 2000, required him to both walk for seven hours each day and stand for eight hours each day. R. 66-67. In this capacity, he did not lift or carry items. R. 67. In prior restaurant jobs, plaintiff was required to stand for between two and ten hours each day, and to walk for between five and eight hours each day. R. 68-69. In these previous jobs, plaintiff regularly lifted jugs containing 4-5 gallons of oil (weight estimated at more than 20 lbs) and carried them approximately 20 feet; he also lifted packs of vegetables and meats weighing approximately eight pounds and carried them three or four feet. Id.

---

[3] Based on the handwriting, it appears that this Disability Report form was not filled in by the plaintiff himself, but rather by the same person ("L. Miranda") who completed the Disability Report – Field Office (Ex. 2E, R. 62-65).

reported taking acetaminophen with codeine, Lipitor, Lathisine Lotion, and Zedithon. R. 78. The New York Hospital Summary List documents that plaintiff was prescribed Glyburide, Lipitor, Glucophage, Neurontin, and testosterone injections. R. 205. The list of claimant's medications provided to the Social Security Administration by plaintiff on February 25, 2003 includes Delatestryl, Lisinopril, Lipitor, Metformin, Glyburide, Neurontin, Metformin/Hydrochloride, and Zaditor. R. 345.

Plaintiff told the Diability Insurance phone screener that he has constant pain from his right knee down to his right toes; painful, swollen, and numb toes; numb feet; and pain in his left big toe and heel. Id. He classified this pain as a "7" on a scale from 1 to 10 before taking pain medication. Id. Plaintiff explained that the pain in his lower extremities developed or became worse when he walked for approximately two and a half hours. Id. Plaintiff also said that he experienced bad headaches which are not helped by medication, and which make his vision blurry. R. 75. Plaintiff also said that he was unable to stand for very long (one to three hours), and often had to sit down in the middle of tasks to rest. Id.

At his hearing, plaintiff told the ALJ that he spent his time watching television, making breakfast, going to church, and visiting family. R. 368. His church is a block and a half from his home; his family lives about five or six blocks from his apartment. R. 372-3. Plaintiff testified that he was only able to walk about three blocks before he would have to find a place to sit down and rest, and that he could only stand for about half an hour at a time. R. 374-5. Plaintiff told the ALJ that he had these limitations because both his legs and his feet hurt from just above the

4

index finger. R. 377-8.

### a. *Treating Physicians*

Plaintiff visited the Elmhurst Hospital Center emergency room on April 8, 1999,

reporting that he had suffered from foot pain for five days. R. 182. Plaintiff noted that the pain

was worse when he was walking. Id. The treating physician noted that plaintiff had congenital

malformations of the hands and feet, and a seven-year history of non-insulin-dependent diabetes

mellitus. Id. Plaintiff's blood glucose level during this visit was 287 mg/dl, significantly above

the normal range of 70-110 mg/dl. R. 197. He was diagnosed with foot pain, prescribed pain

medication, and referred to a podiatrist. R. 183.

On May 5, 1999, plaintiff returned to the Elmhurst Hospital Center emergency room due

to concerns that his blood sugar was high. R.194-96. Based on a finger-stick test, plaintiff's

blood glucose level was 189 mg/dl; however, it was noted that he had been non-compliant with

his diabetic medications. R.196.

Plaintiff next presented to the Elmhurst Hospital Center's ambulatory care department on

September 19, 2000. R. 84-92. Plaintiff complained of a headache that had lasted approximately

one and a half months (R. 92); pain in his right leg during the previous four months (Id.); and

pain in both lower extremities and numbness in both feet that had gotten worse during the

previous months (R. 91). Hospital records note that, in addition to diabetes mellitus, plaintiff has

congenital malformities of both feet and his left hand, missing toes, and that his remaining toes

5

Finger-stick testing at approximately 7:30am revealed that plaintiff's blood glucose level was 244 mg/dl (R. 92); by 11:15am (after plaintiff was presumably treated with insulin), his blood glucose level was 196 mg/dl (R. 88). Additionally, plaintiff's glycated hemoglobin (HgbA1c) level[4] was 8.8%, significantly higher than the reference range of 4.3-6.4%. R. 86. Plaintiff told the Elmhurst Hospital Center staff that he had stopped taking his diabetes medicines approximately one year earlier, when he ran out of medicine after the death of his daughter and abandonment by his wife. R. 89, 91. Plaintiff was restarted on Glyburide, and scheduled for additional lab tests and an eye exam. R. 85.

Plaintiff returned to Elmhurst Hospital Center on October 3, 2000 for a follow-up visit. Finger-stick testing revealed that his blood glucose level was 175 mg/dl; it was noted that Glyburide prescription was giving him sub-optimal control of his diabetes. R. 200. Plaintiff complained of leg pains, but the treating clinician concluded that there was no neuropathy. Id.

Plaintiff next visited the Elmhurst Hospital Center on October 14, 2000, complaining of pain radiating down his right flank to his entire right foot, accompanied by numbness in both lower extremities and his right arm. R. 189. Plaintiff also complained of mild pain radiating to

---

[4] Glycated hemoglobin levels provide an average measure of blood sugar levels over several months. See, e.g., Richard K. Bernstein, M.D., "A Baseline Measure of Your Disease and Risk Profile," Diabetes Solution Revised and Updated: The Complete Guide to Achieving Normal Blood Sugars, *available at* http://www.diabetesincontrol.com/issue188/bernstein.shtml (2003).

189. The attending physician, Dr. Neill Oster, diagnosed plaintiff with probable diabetic neuropathy, and ordered that he be treated with insulin, prescribed pain medication, and scheduled for a follow-up visit to focus on improved blood sugar control. R. 187-8.

Plaintiff returned to Elmhurst Hospital Center on November 15, 2000. R. 173. Unfortunately, it is very unclear from the record what occurred on November 15, 2000; records from September 19, 2000 and November 15, 2000 appear to be intermingled, and the notes made on November 15, 2000 are virtually illegible. R. 84-85, 89-90. On November 26, 2000, when plaintiff presented to the Elmhurst Hospital Center emergency room complaining of left foot pain and swelling after stubbing his toe against a piece of iron five days earlier, the treating physician noted that DP and PT pulses were "poorly palpable," but present. R. 166. At some point in November 2000, plaintiff's Glyburide dose was increased to 10 mg/day. R. 161.

Plaintiff apparently visited the Orthopedic Department at Elmhurst Hospital Center on December 8, 2000, but no details of that visit are included in the record. R. 159. On January 5, 2001, plaintiff received health education focusing on diabetes mellitus and related health complications from Ms. Gonzalez at the Elmhurst Hospital Center. R. 137-140.

On January 17, 2001, plaintiff was seen in Medical Primary Care at Elmhurst Hospital Center. R. 161. He was diagnosed with diabetes mellitus, diabetic neuropathy, and congenital foot malformation. Id. His blood glucose level was recorded as 182 mg/dl, and his HgbA1c level was 8.8%. Id. The attending physician noted that plaintiff's blood glucose levels should be monitored to determine whether the Glyburide prescription was providing good glycemic control.

7

Plaintiff was next seen at the Elmhurst Hospital Center Podiatry Clinic on February 21, 2001. R. 156-7. The treating physician noted that plaintiff suffers from a congenital deformity of his feet in addition to diabetic neuropathy and pain in his lower limbs. Id.

Plaintiff visited the Emergency Service at Elmhurst Hospital Center on March 6, 2001, complaining of pain on the left side of his back, radiating down his left leg. R. 148-141. This pain was diagnosed as probable sciatica, and plaintiff was referred to the Back Clinic. R. 151. The treating physician also noted that plaintiff reported suffering from numbness on his right side from his ribcage to the top of his foot and some numbness on his left side since October 2000, and that plaintiff had decreased sensation in his right lower extremity. R. 149.

On March 12, 2001, plaintiff was seen at the Elmhurst Hospital Center Back Clinic. R. 129. Plaintiff reported having virtually continuous pain in both his back and his legs, and numbness and tingling in his legs. R. 132-4. Plaintiff noted that walking and standing increased his pain. R. 134. The treating physician diagnosed plaintiff with a possible rib fracture or contusion or a possible spleen contusion, and noted that plaintiff suffered from diabetic polyneuropathy. R. 129.

Based on retinal screening conducted on April 5, 2001 at Elmhurst Hospital Center, Dr. Meltzer determined that plaintiff did not suffer from diabetic retinopathy. R. 145.

Plaintiff was seen in Podiatry at the Elmhurst Hospital Center on April 13, 2001. He was diagnosed with congenital foot deformities and neuropathy, and referred to the orthopedic and brace clinics to address his complaints of constant pain in his right knee. R. 143-4. On May 8,

8

femoral syndrome of the right knee, ordered x-rays of the lumbar spine, and prescribed exercises and pain medication. Id.

Plaintiff was first seen at the New York Hospital Medical Center of Queens ("New York Hospital") on May 18, 2001. R. 260. Records from the screening clinic show that plaintiff visited the clinic due to concerns about leg pain and decreased sexual arousal.[5] R. 264. Plaintiff reported increasing numbness, tingling, and loss of sensation in both lower extremities. R. 264. Specifically, plaintiff reported continuous burning, shooting/radiating, and aching pain, which increased with movement. R. 268. Plaintiff rated the pain an "8" on a scale from 1 to 10, and reported taking acetaminophen with codeine to treat the pain. R. 268-9. Plaintiff reported that the pain in his legs began in approximately November 2000, and was worse in his right leg than his left (R. 264); documentation from the Department of Ambulatory Care indicates that plaintiff used a cane to walk. R. 259. Upon examination, Dr. McFarlene noted that plaintiff suffered from decreased peripheral sensation in both lower extremities, but no cyanosis or edema. R. 266. Plaintiff's blood glucose level was 288 mg/dl. R. 272-3. Plaintiff was diagnosed with diabetes mellitus, peripheral neuropathy, possible peripheral vascular disease secondary to diabetes, and

---

[5]Plaintiff's medical records from May 2001 to October 2002 include extensive discussion of his testosterone levels, etc. Because this condition is not directly relevant to plaintiff's Social Security application, I will not summarize the details of these medical reports here. For completeness sake, I note that plaintiff presented with impotence, a small penis and testes, and sparse public hair. R. 279. After conducting a number of tests, plaintiff's physician diagnosed hypogonadism (R. 279), probable panhypopituitarism (R. 281), and central hypothyroidism (R. 284). Due to the complexity of treatment options and patient's language barrier, plaintiff was referred to Dr. Aravelo's Endocrine Clinic. R. 284. Dr. Aravelo additionally diagnosed possible Kallman's Syndrome (hypogonadotropic eunuchoidism). R. 286.

referred plaintiff to a nutritionist. Id.

Plaintiff returned to New York Hospital on June 12, 2001 to obtain medical clearance for a root canal procedure. R. 276-7. Finger-stick testing revealed that plaintiff's blood glucose level was 191 mg/dl.[6] R. 276. Upon examination, it was noted that plaintiff has sensory deficits in both feet, paresthesis (tingling, prickling, numbness or burning sensations) in both lower extremities from the waist, and decreased vibration in his right foot. R. 278. Plaintiff also reported having blurry vision. R. 276. Plaintiff was diagnosed with diabetes and peripheral neuropathy, cleared for dental work, and referred to eye and podiatry clinics. R. 279.

Plaintiff returned to New York Hospital on June 20, 2001 for extensive laboratory testing, mostly related to his hypogonadism and other thyroid problems. R. 282, 238-248. His blood glucose level was measured at 244 mg/dl. R. 282, 244. His IGF-1 (insulin-like growth factor-1) was measured at 59 ng/mL, significantly outside the reference range of 90-360 ng/mL. R. 247.

On July 9, 2001, plaintiff was seen in the New York Hospital Podiatry Clinic. R. 287. Plaintiff complained of painful feet, especially after walking for two hours. Id. The treating physician noted that plaintiff is missing toes on both feet, and that there was pain on palpitation of the remaining toes. Id. Plaintiff's feet had calluses and hyperkeratotic tissue, for which the

---

[6]Defendant notes in her Memorandum of Law in Support of Her Motion for Judgment on the Pleadings that plaintiff's HgbA1c level was 6.4% on June 12, 2001, citing to R. 277. Based on an examination of the record (specifically pages 277 and 234), it appears that this HgbA1c test was not conducted at New York Medical Hospital and is of unknown origin. R. 234. Given that HbgA1c tests long-term blood glucose and that the June 2001 value of unknown origin is so different from the HbgA1c tests conducted at both Elmhurst Hospital Center and the New York Hospital, I am concerned that the reported June 2001 HgbA1c value may be incorrect.

On July 11, 2001, plaintiff's blood glucose level was 172 mg/dl (R. 229) and his HgbA1c level was 8.9% ( R. 228). When plaintiff returned to the New York Hospital Endocrine Clinic on August 10, 2001, his blood glucose level was 151 mg/dl. R. 291. He suffered from significantly decreased vibratory sensation in both lower extremities. Id. The treating physician prescribed Glucophage, in addition to plaintiff's Glyburide prescription. R. 292.

Plaintiff was seen again in the Endocrine Clinic on September 28, 2001. R. 296. Plaintiff reported that his blood sugar levels were generally under 150 mg/dl when he tested at home. Id. However, plaintiff reported "severe numbness" of his right leg. Id. Dr. Aravelo ordered laboratory tests prior to plaintiff's next visit, and referred plaintiff to a neurologist. Id.

Plaintiff was seen by Dr. McFarlene at the New York Hospital primary care clinic again on October 12, 2001. R. 297. Finger-stick testing revealed that his blood glucose level was 318 mg/dl. Id. According to laboratory tests conducted that day, plaintiff's serum glucose level was 265 mg/dl and his HgbA1c level was 6.9%. R. 224-5. Dr. McFarlene noted that plaintiff reported having difficulty following his current diet regime, and discussed the importance of testing his blood sugar before meals to maintain tighter control. R. 298. Dr. McFarlene also reported that plaintiff complained of pain in his left toes over the previous three weeks, and noted in her physical exam that plaintiff had calluses on his left toes. Id. The attending physician, Dr. Das, additionally noted that plaintiff complained of occasional lower back pain and had hyperkeratotic skin on his feet. R. 299. Plaintiff was referred to podiatry, the diabetes clinic, and a nutritional consult. Id. He was instructed to continue taking his diabetic medications

11

On October 19, 2001, plaintiff's serum glucose level was either 365 mg/dl (R. 288) or 201 mg/dl (R. 222). His HgbA1c level was 8.7%. R. 222. He was instructed to follow-up with the Diabeties Clinic. R. 288. When plaintiff visited the Diabetes Clinic on October 26, 2001, he reported having seen a nutritionist and an ophthalmologist. R. 304. He reported continued pain in his legs and feet. Id. Dr. Aravelo increased plaintiff's Glucophage prescription and encouraged plaintiff to follow the diet recommended by the nutritionist and attempt to lose weight. Id.

Plaintiff was seen in Podiatry at New York Hospital on December 17, 2001. R. 306. The podiatrist noted that there was no edema or erythema of the extremities and that vascular pulses were palpable bilaterally; however, protective sensation was absent bilaterally in the feet. Id. Additionally, the podiatrist noted that plaintiff had painful hyperkeratotic tissue, and "thickened, discolored, dystrophic toenails with subungual debris." R. 307. Plaintiff was diagnosed with onychomycosis (ringworm involving the nails) and tyloma (calluses), and underwent bilateral debridement of the nails and hyperkeratotic tissue. Id. Additionally, plaintiff was referred to the "Ortho clinic" based on the fact that he reported pain and numbness in his right leg and foot lasting throughout the past year. R. 324.

Laboratory tests conducted on February 2, 2005 demonstrated that plaintiff's serum glucose level was 207 mg/dl. R. 213. When plaintiff returned to Podiatry on February 11, 2005, he was found to have elongated thick toenails with subungual debris and hyperkeratotic tissue

12

On February 24, 2002, plaintiff's serum glucose was measured at 207 mg/dl; his HgbA1c level was 9.3%. R. 302, 323. When plaintiff was seen in the Endocrine/Diabetes Clinic on March 15, 2002, his blood glucose was measured at 331 mg/dl. R. 303. He reported average blood glucose levels between 230 mg/dl and 260 mg/dl, but admitted that he was not measuring his blood sugar regularly. Id. Given that plaintiff's February 2002 HbgA1c level was so high (9.3%), plaintiff's Glucophage prescription was increased to 1000mg twice a day. Id. When plaintiff returned to New York Hospital on April 1, 2002 for laboratory tests, his serum glucose was 177 mg/dl (R. 211), and his HbgA1c level was 8.8% (R. 206).

When plaintiff was seen in the Podiatry Clinic on May 6, 2002, he was noted to have claw feet. R. 312. His pedal pulses were palpable, and there was no sign of edema or erythema. Id. However, plaintiff had elongated dystrophic toenails with subungual debris and hyperkeratotic tissue bilaterally. Id. Plaintiff underwent debridement of his toenails and calluses, and was instructed on diabetic footcare. Id.

On May 10, 2002, his serum glucose was 124 mg/dl. R. 208. When plaintiff was seen in the Endocrine/Diabetes Clinic on May 28, 2002, he reported foot pain and numbness in his left leg, and was found to have decreased sensation in his left leg. R. 313. Patient was restated on Glyburide and laboratory studies were ordered. Id.

Between May 24, 2002 and October 12, 2002, plaintiff received his testosterone injections and refilled his Glyburide prescription, but was not seen in the Diabetes Clinic. When plaintiff was seen on October 12, 2002, his blood glucose level was 186 mg/dl, and his peripheral

13

### b. *Consultative Physicians*

### 1. **Dr. Anita F. Shulman, Diagnostic Health Services, Inc.**

Dr. Shulman, an internist working for Diagnostic Health Services, Inc., examined the

plaintiff on January 25, 2001. R. 93. Dr. Shulman noted that plaintiff has a history of diabetes

for the past six years. Id. Dr. Shulman found that plaintiff was alert and oriented. Id. His

motor, sensory, and deep tendon reflexes (DTRs) were all normal, and straight leg raising was

negative. Id.

Dr. Shulman noted that plaintiff's right hand is deformed. R. 94. The second finger on

his right hand is missing, the fourth finger on his right hand has deformities, and his right hand is

deformed due to the shortening and abnormality of the finger. Id. As a result of this deformity,

Dr. Shulman concluded that plaintiff does not have full dexterity of the right hand, and therefore

does not have the full use of both hands. Id.

Dr. Shulman also noted that plaintiff's feet – both right and left – are deformed. Id.

Plaintiff has only three toes on each foot. Id. The deformity of the left foot was described as a

congenital anomaly. Id. The right foot had "multiple deformities which appear to be congenital

in nature." Id. Dr. Shulman observed that these deformities affect the plaintiff's station and gait;

he is unable to "tendon walk" and his "gait is abnormal." Id.

Dr. Shulman found no clubbing, cyanosis, or edema of the extremities. Id. Additionally,

14

Dr. Shulman diagnosed the plaintiff with diabetes and deformities of the extremities. Id. She opined that plaintiff was able to do "sedentary work" at the time of her examination. Id.

### 2. Dr. Asad Ali

On February 6, 2001, plaintiff was examined by Dr. Asad Ali at the request of the New York State Department of Temporary and Disability Assistance, Division of Disability Determinations. R. 97. Dr. Ali reports that plaintiff had a ten year history of non-insulin dependent diabetes mellitus. Id. Dr. Ali reported that the plaintiff complained of constant numbness, tingling, and pain in his feet and knee joints. R. 98. Plaintiff also reported that he was unable to stand for very long, because "his knee joints start hurting him" after approximately two hours. Id.

Dr. Ali noted that the second and fifth toes of plaintiff's right foot were amputated at the age of ten years, and the distal phalanx of plaintiff's right index finger was amputated when he was twenty years old. Id. During his "general physical examination," Dr. Ali observed that plaintiff's distal pulses were normal. Id. While conducing his "sensory examination," Dr. Ali found mild distal sensory impairment in the plaintiff's feet, but concluded that Romberg's sign was negative. Id. Finally, Dr. Ali noted that "apparently, coordination is within normal limits and gait is stable." Id. Dr. Ali concluded that plaintiff probably suffers from "very mild distal central neuropathy which is most likely related to diabetic neuropathy." Id.

15

2001. R. 101. Dr. Fajardo reported that plaintiff, who had a seven-year history of diabetes mellitus, presented with complaints of diminished vision and numbness in upper and lower extremities. Id. Additionally, Dr. Fajardo cites plaintiff's complaints of headaches and pain in both eyes, both legs and feet, and hands. Id.

Upon physical examination, Dr. Fajardo observed deformity and amputation of the second toe on both feet. R. 102. However, he noted that peripheral pulses were intact and symmetrical throughout, and there was no clubbing, cyanosis, or edema. Id. Dr. Fajardo found that plaintiff was able to ambulate without assistance, had normal station and gait, and was able to get on and off the examination table without difficulty. Id. Plaintiff's joints all had full range of motion, without deformity, swelling, or tenderness. Id. The neurological exam was normal, but the sensory exam revealed decreased peripheral sensation in both lower extremities. Id.

Dr. Fajardo diagnosed type II diabetes mellitus, diabetic neuropathy, hyperlipidemia, and deformity of both feet. Id. With reference to plaintiff's ability to perform work-related activities, Dr. Fajardo noted that plaintiff "is able to sit, stand, walk, lift, carry, handle objects, hear speak and travel. He is able to perform sedentary to light activities." Id. Based on Dr. Fajardo's evaluation and the information submitted by plaintiff regarding his condition, HS Systems issued its "Review Team Recommendation." R. 100. HS Systems noted that plaintiff was capable of performing jobs which "involve[] no lifting and minimal walking / bending / standing, pushing and pulling." Id. HS Systems also noted that plaintiff's work would need to involve easy access to a bathroom and limited travel distance, and suggested that plaintiff avoid rush hour travel. Id.

16

information, write messages, etc.). Id.

### c. *Testifying Physicians*

Dr. Richard Ores reviewed the medical evidence, listened to the plaintiff's testimony

before the ALJ, and testified at the hearing. R. 380-394.

In his initial, summary testimoney, Dr. Ores testified that plaintiff has had type II diabetes

mellitus and was hypoglycemic.[7] R. 380. Dr. Ores also testified that plaintiff has congenital

anomalies of both feet; he noted that plaintiff had undergone seven surgeries on his right foot and

two or three surgeries on his left foot.[8] R. 381. Dr. Ores stated that "it is painful when [plaintiff]

walks and stands." Id. He also informed the ALJ that plaintiff complained of back pain

radiating to the left leg and "anomalies of both the lower legs." Id. Dr. Ores stated that plaintiff

---

[7]Hypoglycemia is the abnormally low level of the sugar glucose in the blood. The court notes that there is no evidence in the record that plaintiff has ever suffered from hypoglycemia. The records collected from both Elmhurst Hospital Center and New York Hospital include the results of numerous blood glucose tests performed on the plaintiff between October 2000 and October 2002; the results of every blood glucose test conducted indicate that plaintiff's blood glucose was significantly higher than the normal range of 70-115 mg/dl. See, e.g., R. 197, 161, 200, 189, 161, 272-3, 276, 282, 229, 297, 288213, 302, 318.

[8]Dr. Ores had reviewed plaintiff's medical records (which, due to detailed description of plaintiff's treatment for hypogonadism, panhypopituitarism, and central hyypothyroidism, indicate clearly that plaintiff is male) and observed plaintiff testifying immediately before Dr. Ores' testimony. However, Dr. Ores referred to the plaintiff, Mr. Juan Martinez, as "she" throughout most of his testimony. R. 382-384, 386, 387. Although Dr. Ores referred to plaintiff as "he" in the very beginning of his testimony, he proceeded to use the pronouns "she" and "her" throughout the central portion of his testimony, even after plaintiff's lawyer asked him "You're referring to Mr. Martinez, right?" R. 382.

uncontrolled was "well controlled" at the time of the hearing.[9] Dr. Ores noted that plaintiff was

being treated with testosterone, and stated that "often this comes from central hypothyroidism";

Dr. Ores appeared not to be aware that plaintiff had been diagnosed with hypogonadism and

panhypopituitarism. Id. Finally, Dr. Ores stated his opinion that none of the above medical

problems met the criteria for total disability as per the Social Security Administration: "she can

sit, she can use her hands. She sees well. She can obey people giving her orders to do

something. She worked in a restaurant. She's not totally disabled." R. 381-2. Dr. Ores

suggested, however, that plaintiff should possibly undergo psychiatric evaluation, because "she

may equal something [a listing] there."[10]

Upon questioning by plaintiff's attorney, Dr. Ores stated that diabetic neuropathy takes

ten to fifteen years to develop, and repeatedly insisted that plaintiff "doesn't have it." R. 382,

---

[9]To the court's knowledge, there are no reports of plaintiff's blood glucose levels for the seven months prior to the ALJ hearing in the medical records, and plaintiff was not asked about his recent blood glucose levels during his testimony; it is therefore hard to know how Dr. Ores knew that his diabetes was "well controlled" at the time of the hearing. There was some improvement in plaintiff's blood glucose levels in April and May of 2002 (R. 206, 208), but his latest test, in October 2002, illustrated that his blood glucose levels were rising again. R. 318. Dr. Ores also states, later on in his testimony, that blood glucose levels of 180 mg/dl and 100 mg/dl are "typical" for treated diabetics. R. 383. This testimony seems inconsistent with the fact that the normal range for blood glucose levels is between 70 and 115 mg/dl. Id.

[10]It is worth noting here that there is absolutely no indication in the medical records from treating or consulting physicians that plaintiff suffers from any sort of psychiatric problem. In fact, he is repeatedly described as alert, oriented, appropriate, and cooperative, with normal behavior and affect. R. 93, 98, 101-2.

18

Dr. Ores admitted that diabetic neuropathy begins with numbness and tingling sensations, and progresses to difficulty with movement. R. 384. At one point, Dr. Ores admitted that an individual with diabetic neuropathy would have difficulty standing and walking for prolonged periods. R. 385. Later on during his testimony, however, Dr. Ores, stated his opinion that someone with diabetic neuropathy, numbness and tingling in the lower extremities would be able to stand and walk for six hours without problems, assuming that he or she had "normal legs." R. 387. When plaintiff's attorney attempted to get Dr. Ores to clarify his statement, Dr. Ores responded "With normal legs... you mixed two things here... Medicine is not two and two equals four. You [c]an ask me if she has amputated legs, can she walk? No.... The neuropathy, which is very mild, has no effect on her standing and walking. It is not her problem, his problem." R. 387.

Dr. Ores also insisted that notations of "polyneuropathy, severe tenderness over the right side" in the medical record (Exhibit 9F from Elmhurst Hospital Center, March 12, 2001) was irrelevant because "severe tenderness has nothing to do with neuropathy" and polyneuropathy is merely a disease of nerves, and could therefore be any nerves in the body. R. 389. Additionally, Dr. Ores opined that someone with patellofemoral syndrome and muscle spasms would be able to engage in prolonged standing and walking. Id. Dr. Ores initially denied that the plaintiff suffered from peripheral vascular disease. R. 391. When shown hospital records from May 18, 2001 indicating that plaintiff was diagnosed with peripheral vascular disease, Dr. Ores responded "It says so. I don't know if he has this." R. 391-2.

Juan Martinez on June 19, 2001. R. 105-112. Although the "List of Exhibits" included in the record submitted to the court by the Social Security Administration identifies this report as a "RFC - Residual Functional Capacity Assessment – Physical (completed by DDS physician)" (R. 2), the word "Medical" is crossed out in the phrase "Medical Consultant's Signature" on the last page, above an illegible signature. R. 112. It is therefore entirely unclear whether this report was actually completed by a physician.[11]

The consultant states that plaintiff has "IDDM [presumably an error, since plaintiff has non-insulin dependant diabetes mellitus – NIDDM] with mild diabetic neuropathy, involving lower extremities. Ambulation is unassisted." R. 106. Additionally, plaintiff is noted to have congenital deformities of both feet, which renders him unable to tandem walk. Id. Finally, the consultant notes that plaintiff has a congenital deformity of his right hand, which results in a somewhat diminished grip in his right hand. Id. The RFC concludes that plaintiff is capable of occasionally lifting and carrying 20 pounds, frequently lifting and carrying 10 pounds, standing and/or walking for about six hours in an eight hour workday, sit for about six hours in an eight hour workday, and has no additional limitations related to pushing and pulling. R. 106. Therefore, the consultant concludes that plaintiff's RFC is limited to light work. Id.

---

[11]Plaintiff argues that, because the RFC was not completed by a physician, it should not be considered medical evidence. Because I am remanding this case for further proceedings by the Social Security Administration on other grounds, it is unnecessary for this court to decide at this time whether the report was completed by a physician and to what weight it is entitled. The Social Security Administration is encouraged, on remand, to either provide documentation that the report was completed by a physician or to obtain another RFC.

work. R. 110. The consultant states that plaintiff is "only partially credible," but does not explain the basis of this determination. Id. Finally, the consultant summarizes the examining physicians statements regarding limitations, but fails to assess whether there are any treating source statements. R. 111.

## DISCUSSION

1.    Standard of Review

This case comes to the court for review of the Commissioner's decision that the plaintiff is not disabled. Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1). An individual is considered to be under a "disability" if his impairment is of such severity that he is unable to perform his previous work and, given his age, education, and work experience he is not able to engage in any other type of substantial gainful employment in the national economy. See 42 U.S.C. § 423(d)(2)(A). In determining whether an individual is disabled, the Commissioner is to consider both objective and subjective factors, including "objective medical facts, diagnoses or medical opinions based on such facts, subjective evidence of pain and disability testified to by the claimant or other witnesses, and the claimant's educational background, age, and work experience." Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980)(citations omitted).

result in death or that had lasted or could be expected to last for a continuous period of at least twelve months; and (2) the existence of such impairment was demonstrated by medically acceptable clinical and laboratory techniques. 42 U.S.C. §§ 423(d), 1382(a); see also Shin v. Apfel, 1998 WL 788780 at *5 (S.D.N.Y. November 12, 1998) (citing cases).

The SSA has promulgated a five step process for evaluating disability claims. See 20 C.F.R. § 404.1520.[12] The Second Circuit has characterized this procedure as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful employment. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform."

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)). The plaintiff has the burden of establishing disability on the first four steps of this analysis. On the fifth step, however, the burden shifts to the Commissioner to

---

[12]The regulations governing disability determinations for DIB and for SSI are identical. Citations in the remainder of this opinion are to the DIB regulations found in Part 404 of the Social Security regulations. The SSI regulation analogous to the DIB regulation found at 20 C.F.R. § 404.15xx would be at 20 C.F.R. § 416.9xx.

The court's role in reviewing the decisions of the Social Security Administration ("SSA") is narrowly confined to assessing whether the Commissioner applied the correct legal standards in making his determination and whether that determination is supported by substantial evidence. See 42 U.S.C. §§ 405(g), 1383(c); Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987); Donato v. Secretary, 721 F.2d 414, 418 (2d Cir. 1983). Substantial evidence is defined as "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citation omitted). The Commissioner's findings and determination are supported by substantial evidence, the decision must be upheld, even if there is substantial evidence for the plaintiff's position. Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991) ("'The court may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'") (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

However, administrative decisions regarding claimants' eligibility for disability benefits are "surprisingly vulnerable to judicial review" due to the Commissioner's creation – and the courts' subsequent enforcement – of various procedural obligations to which ALJs must adhere. Molina v. Barnhart, No. 04 Civ. 3201, 2005 U.S. Dist. LEXIS 17981 at *21 (S.D.N.Y. Aug. 17, 2005). An ALJ's failure to adhere to any of these regulations constitutes legal error, permitting reversal of the administrative decision. Id.; see also Toribio v. Barnhart, No. 02 Civ. 4929, 2003 U.S. Dist. LEXIS 10367 at *7 (S.D.N.Y. Jun. 28, 2003).

23

claimant's treating physician, as opposed to the opinions of consulting and/or testifying physicians who have only examined the claimant once. See Schisler v. Heckler, 787 F.2d 76, 85 (2d Cir. 1986). The opinion of a treating physician is given controlling weight if it is well supported by medical findings and is not inconsistent with other substantial evidence. Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998) (citing 20 C.F.R. § 404.1527(d)(2)). The treating physician's opinions are particularly valued because of the relationship developed over time between the treating physician and his or her patient: "What is valuable about the perspective of the treating physician -- what distinguishes him from the examining physician and from the ALJ -- is his opportunity to develop an informed opinion as to the physical status of a patient." Peed v. Sullivan, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991).

In this case, ALJ Fier mistakenly identified a consulting physician, Dr. Fajardo, as a "treating physician" and gave controlling weight to his medical opinion regarding the nature and severity of plaintiff's impairments. R. 23 ("In considering the evidence, the undersigned is required.... to give controlling weight to the medical opinion of a treating source if... The undersigned concludes that Dr. Fajardo's medical opinion regarding the nature and severity of the claimant's impairments is consistent with the medical evidence of record and entitled to controlling weight in this decision.").

Dr. Fajardo, an internist employed by HS Systems, Inc. ("The Health Evaluation People"), is a consulting rather than a treating physician. R. 101. Dr. Fajardo examined the plaintiff only once, on April 3, 2001, and recommended that plaintiff "follow up with treating

3. <u>ALJ's Failure Develop the Record with Regard to Treating Physicians' Opinions</u>

Due to the non-adversarial nature of hearing on disability benefits, the ALJ has "an affirmative obligation to develop the administrative record." <u>Perez v. Chater</u>, 77 F.3d 41, 47 (2d Cir. 1996). <u>See also</u> 20 C.F.R. § 404.1512(d)-(f) (setting forth affirmative obligations of ALJ); <u>Batista v. Barnhart</u>, 326 F. Supp. 2d 345, 353 (E.D.N.Y. 2004); <u>Tejada v. Apfel</u>, 167 F.3d 770, 774 (2d Cir. 1999); <u>Hardy v. Comm'r of Soc. Sec.</u>, No. 96 Civ. 5733, 1998 WL 199854, at *5 (E.D.N.Y. Mar. 27, 1998) (noting that "[w]hile the burden of establishing disability rests with the plaintiff . . . the Commissioner is required to develop a complete medical record and make 'every reasonable effort' to obtain all medical evidence from plaintiff's treating sources" (quoting 42 U.S.C. § 423(d)(5)(B)) (internal citation omitted)). Although the ALJ's obligation to develop the record is heightened where the claimant appears pro se, the obligation exists even when the claimant is represented by counsel. <u>See Rosa</u>, 168 F.3d at 79; <u>Perez</u>, 77 F.3d at 47.

Given the treating physician rule, the ALJ has a particular obligation to develop the record with respect to the treating physician. The ALJ must "make every reasonable effort to obtain not merely the medical records of the treating physician but also a report that sets forth the opinion of that treating physician as to the existence, the nature, and the severity of the claimed disability." <u>Peed</u>, 778 F. Supp. at 1246. "[R]aw data" or even complete medical records are insufficient by themselves to fulfill the ALJ's duty:

than that of an examining physician who sees the claimant once and who performs the same tests and studies as the treating physician. It is the *opinion* of the treating physician that is to be sought; it is his *opinion* as to the existence and severity of a disability that is to be given deference.

Id. Where no such opinion is included in the existing record, the ALJ should "recontact[] the claimant's treating physician" to obtain this information. Batista, 326 F. Supp. 2d at 353 (internal quotation omitted).

In this case, ALJ Fier failed to adequately develop the medical record. Although extensive medical records including progress notes and laboratory results were submitted by both Elmhurst Medical Center and New York Hospital, plaintiff's treating physicians did not submit opinion reports as to plaintiff's functional abilities. The ALJ failed to make reasonable efforts to obtain such opinion reports from Drs. Aravelo, Schwartz, and McFarlane, despite the fact that these physicians are identified in the medical records and were listed during the hearing as plaintiff's treating physicians. R. 366-7. The ALJ could have appended to the subpoena he directed to the hospitals a request for opinions from Drs. Aravelo, Schwarz, and McFarlane; alternatively, the ALJ could have provided the plaintiff with the relevant form ("Medical Assessment of Ability to Do Work Related Activities") and instructed him to ask his physicians to complete the form. See, e.g., Molina, 2005 U.S. Dist. LEXIS 17981 at *24. The ALJ's failure to fully develop the record constitutes legal error.

26

In addition to failing to develop the record as to treating physicians' opinions, ALJ Fier appears to have given little if any weight to the medical evidence in the form of treatment progress notes written by plaintiff's treating physicians. "While it is not necessary for an ALJ to 'reconcile every conflicting shred of medical testimony,' if the ALJ fails to consider evidence in the record, the Court 'must be able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence.'" Molina, 2005 U.S. Dist. LEXIS 17981 at *29-30 (quoting Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981) and Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983)).

ALJ Fier gave great weight to the testimony of Dr. Ores, a medical expert who had neither treated nor examined the plaintiff.[13] Dr. Ores testified that plaintiff suffered from congenital deformities and "very mild" diabetic neuropathy, and asserted that these medical conditions would not prohibit plaintiff from standing and walking for six hours out of an eight-hour workday. R. 393-4. As discussed above, the ALJ also gave "controlling weight" to Dr. Fajardo, a consulting physician. Dr. Fajardo diagnosed the plaintiff with diabetic neuropathy. R. 102. The record is somewhat unclear as to Dr. Fajardo's assessment of plaintiff's residual

---

[13]It is generally agreed that it is the function of the ALJ, rather than the reviewing courts, to assess the credibility of witnesses. See, e.g., Aponte v. Sec'y, Dep't of Health & Human Serv., 728 F.2d 588, 591 (2d Cir. 1984). However, Dr. Ores' testimony was so riddled with errors (e.g. referring to the plaintiff as "she" despite allegedly having reviewed the medical record which documents plaintiff's hypogonadism and having listened to the plaintiff testify immediately prior to his own testimony (R. 382-4, 386-7)) and exaggerated statements (e.g. suggesting that the only way that neuropathy would stop plaintiff from walking would be if plaintiff's also had an amputated leg (R. 387)) that it is difficult to accept his medical opinions as either well-informed or unbiased.

R. 102. The final analysis submitted by his employer, HS Systems, Inc., however, concludes that plaintiff can perform jobs involving "no lifting and minimal walking / bending / standing, pushing and pulling." R. 100.

Although ALJ Fier briefly summarized the extensive medical records and laboratory reports submitted by the hospitals at which plaintiff was regularly treated, he appears to have given these records little or no weight. The ALJ states that "[t]he medical evidence indicates that the claimant has diabetes with mild diabetic neuropathy and congenital deformities of both feet." R. 20. In fact, the extensive collection of medical notes of treating physicians thoroughly documents that plaintiff was repeatedly specifically diagnosed with diabetic neuropathy and/or peripheral neuropathy. See, e.g., R. 85, 187-8, 161, 156-7, 129, 143-4, 273, 279, 299, 203. These treatment progress notes indicate that plaintiff suffered from diabetic neuropathy as early as September 2000. R. 85.

Additionally, the ALJ makes no mention of the reports by plaintiff's treating physicians that refer to plaintiff's pain. The treatment progress notes thoroughly document plaintiff's complaints of numbness, tingling, and leg and foot pain. See, e.g., R. 183, 92, 189, 156-7, 149, 132-4, 264, 268, 266, 278, 287, 296, 304, 324, 313. The ALJ's opinion also does not discuss the treating physicians' reports summarizing clinical findings which are consistent with plaintiff's subjective reports of pain. For example, the treatment progress notes contain repeated determinations – based upon physical examinations – that plaintiff had reduced sensation in his lower extremities. See, e.g., R. 149, 278, 291, 313.

28

what evidence he evaluated and accepted in making his decision, and what evidence he rejected." Burch v. Bowen, No. 86 Civ. 1742, 1987 WL 9193 (S.D.N.Y. March 30, 1987) (citing Carnevale v. Gardner, 393 F.2d 889, 891 (2d Cir. 1968)); see also Blundo v. Sullivan, No. 90 Civ. 3781, 1992 WL 390237, *5 n.8 (E.D.N.Y. Dec. 8, 1992) ("[T]he ALJ's failure to acknowledge the objective findings of physicians who have treated or examined the plaintiff, and at the very least, explain his rejection of such evidence is plain error."). In the absence of an explanation of why the ALJ rejected the evidence set forth above, a reviewing court cannot properly carry out its function. Here, ALJ Fier failed to explain his reasons for disregarding reports by many of plaintiff's treating physicians that could be interpreted as supporting plaintiff's claims that he suffered from significant numbness and pain in his lower extremities.

## CONCLUSION

Remand is appropriate when the Commissioner failed to correctly apply the law and the regulations. See Melkonyan v. Sullivan, 501 U.S. 89, 101 (1991); Rosa, 168 F.3d at 82-83. Accordingly, because the ALJ incorrectly identified the treating physician, failed to adequately develop the record, and failed to adequately consider the medical evidence provided by treating physicians in reaching his determination of the plaintiff's residual functional capacity, this case is remanded to the Commissioner for further proceedings consistent with this opinion.

Allyne R. Ross
United States District Judge

Dated: November 4, 2005
Brooklyn, New York

SERVICE LIST:

*Counsel for Plaintiff:*
Richard P. Morris
Klein, Wagner & Morris
277 Broadway,
9th Floor
New York, NY 10007

*Counsel for Defendant:*
John M. Kelly
United States Attorneys Office
One Pierrepont Plaza, 14th Floor
Brooklyn, NY 11201